**KEWANEE OIL COMPANY,**
**Plaintiff-Appellant,**

v.

**BICRON CORPORATION et al.,**
**Defendants-Appellees.**

**Nos. 71–1041, 71–1042.**

United States Court of Appeals,
Sixth Circuit.

Argued April 10, 1972.

Decided May 10, 1973.

Edward P. Troxell, of Jones, Day, Cockley & Reavis, Cleveland, Ohio, Barry L. Springel, Cleveland, Ohio, on brief; Robert P. Mooney, John P. Hazzard, Kewanee Oil Co., Cleveland, Ohio, of counsel, for plaintiff-appellant.

William C. McCoy, Jr., of McCoy, Greene & Howell, Cleveland, Ohio, James A. ·Hofelich, Cleveland, Ohio, on brief;

Theodore L. Abeles, Lum, Biunno & Tompkins, Newark, N. J., of counsel, for defendants-appellees and cross-appellants.

Before PECK, MILLER and KENT, Circuit Judges.

KENT, Circuit Judge.

This is an appeal and cross-appeal from a judgment of the District Court which held that the plaintiff-appellant, Kewanee Oil Company, had a protectable property right in 20 of its 40 claimed trade secrets in suit. The District Court granted a permanent injunction which enjoined defendants-appellees from disclosing and/or using the 20 trade secrets in question. The District Court found that Kewanee had failed to establish that the remaining 20 processes, procedures and manufacturing techniques were in fact trade secrets. Kewanee appealed on the theory that all 40 claimed trade secrets should have been protected while Bicron Corporation and the individual defendants filed a cross-appeal maintaining that none of the 40 alleged trade secrets should have been protected.

Kewanee, through its unincorporated subordinate division, Harshaw Chemical Company (hereinafter Harshaw or Kewanee), manufactures various types of synthetic crystals. The products resulting from the use of the alleged trade secrets here in controversy are described as sodium iodide thallium activated scintillation crystals. Such crystals are used in connection with nuclear fission equipment utilized in geophysical surveys searching for uranium and oil, in clinical measurement of radio isotopes and in certain aspects of outer space exploration. The crystals have a unique property which permits them to generate a minute particle of light when struck by ionizing radiation.

Harshaw's research into the growth (manufacture) of such crystals commenced in 1949. As a result of improvements in the manufacturing processes over the years Harshaw was able to produce progressively larger crystals until in 1966 it was able to grow a 17 inch crystal, an accomplishment which no other competitor had achieved. Harshaw claims that as a result of its research and discoveries over the years it developed many processes, procedures and manufacturing techniques in the areas of: (1) the purification of raw materials; (2) the growth of the crystals; and (3) the preparation and encapsulation of the crystals, all of which, it claims, are trade secrets, giving it a commercial advantage over its competitors.

Each of the individual defendants is a former employee of Harshaw, having a particular skill in some aspect of the production of synthetic crystals. As a condition of employment with Harshaw each of the individual defendants executed at least one agreement, and some of them more than one agreement, which required them, as Harshaw employees, to promise not to disclose confidential information or trade secrets obtained as employees of Harshaw. After varying periods of employment by Harshaw and its predecessor, the employments of the individual defendants were terminated, some voluntarily and some involuntarily. Defendants Hamner, Menefee, Spurney and Suscheck formed the defendant Bicron Corporation to compete with Harshaw in the manufacture of sodium iodide thallium activated scintillation crystals. The defendants Richert and Novak later became employees of Bicron. Although Harshaw required more than 16 years to perfect its processes and manufacturing techniques to such an extent that it was able to grow a 17 inch crystal, Bicron and its employees (the defendants here) claimed that Bicron was capable of producing such a crystal in approximately 9 months after the enterprise was started.

On this record, as a whole, it appears clear to us, as it did to the District Court, that the individual defendants used the information obtained during their employment by Harshaw for the benefit of Bicron. There can be no

question on this record but what these individual defendants appropriated, to the benefit of Bicron, Harshaw's secrets, processes, procedures and manufacturing techniques.

The jurisdiction of the trial court, not questioned, is based upon the diversity of citizenship of the parties. Title 28 U.S.C. § 1332. Clearly the jurisdictional amount is involved. The Ohio law relating to trade secrets is applicable. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

In essence, the issues presented on this appeal, except one which will be discussed hereafter, deal with the evidence and the extent of the proof offered and required. Each party finds fault with the findings of fact and conclusions of law adopted by the District Judge. The appellees and cross-appellants, Bicron, et al., claim error on the part of the District Court in its refusal to conclude that Kewanee was not entitled to recover because of failure on the part of Harshaw to maintain security, i. e., secrecy, and cites cases which if read out of the context of this lawsuit might give some support to the cross-appellants' claim. Excelsior Steel Furnace Co.' v. Williamson Heater Co., 269 F. 614 (6th Cir. 1920); Healey & Son, Inc. v. Murphy & Son, Inc., 357 Mass. 728, 260 N.E.2d 723 (1970). The record demonstrates that while unnecessary employees were permitted access to certain manufacturing areas wherein alleged trade secrets were used there was nothing in the evidence to show that such access was of sufficient scope as to disclose the nature of the trade secrets to employees who were not required to have knowledge of them by the nature of their employment. In addition the mere showing or writing about certain manufacturing techniques was found by the District Judge to be insufficient to amount to a disclosure to the public of those trade secrets involved in this law suit, which were found by the District Court to be trade secrets within the law.

The appellant complains because of the failure of the trial court to find that each of the 40 claimed trade secrets was in fact a trade secret. The trial court found that some of the elements of the devices in question relating to processes or procedures in the production of the crystals would be only ordinary good manufacturing techniques, an example being one relating to "scrap recoveries." (Plf.Exh. 56(1)(i)). A recent article in a popular magazine demonstrates the accuracy of some of the trial court's conclusions relating to security. In the *SATURDAY REVIEW* for July 8, 1972, there is a nontechnical description of the nature of synthetic crystals and a description of some of the manufacturing techniques used in the production of such crystals.

This Court has carefully reviewed the Ohio law applicable in the determination of what is and what is not a trade secret and what constitutes misappropriation of such a secret. W. R. Grace & Co. v. Hargadine, 392 F.2d 9 (6th Cir. 1968). There is no need for repetition of that review here.

■■ It would be inappropriate for us to discuss the nature of the alleged trade secrets found by the District Judge to be trade secrets within the meaning of the Ohio law and those found not to be trade secrets. Suffice it to say that the District Judge fully considered all of the evidence offered, and that the alleged errors are based upon the appellant's and cross-appellants' disagreement with the trial court's evaluation of the credibility of the witnesses and the weight of the evidence. It is not for this Court to reconsider the credibility of the witnesses or to reweigh the evidence. After careful consideration of the entire record it appears that the findings of fact of the District Judge are not clearly erroneous within the meaning of Rule 52, Federal Rules of Civil Procedure, 28 U.S.C., and the District Judge properly applied the Ohio law relating to trade secrets.

If only the issues already discussed had been presented to this Court we would be required to affirm the judg-

ment of the District Court. However, in addition to the issues already discussed there is a very serious and important issue of a claimed conflict with the provisions of the Constitution of the United States relating to patents, Article I, Section 8 (Clause 8):

"Section 8. The Congress shall have Power * * *.

"To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries; * * *."

and the Patent Laws adopted pursuant thereto, Title 35 U.S.C. § 101 et seq., and whether that conflict requires the application of the provisions of the Supremacy Clause of the Constitution, Article VI, (Clause 2):

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

We must determine whether the trade secrets laws of the State of Ohio are required to be struck down in this case as being in conflict with the United States Patent Laws, and, if so, to what extent. Kewanee urges that the issue presented to this Court requires a determination as to whether the enforcement of any and all state trade secrets laws conflict with the policies of the United States Patent Laws. Thus framed we consider the issue too broad for our consideration in this case.

■ Our inquiry into the subject should be governed by certain facts which are admitted or obvious from the evidence offered and the concessions of counsel. First, the trade secrets in question relating to the processes, procedures and manufacturing techniques of Harshaw, as conceded by counsel for Kewanee, were "patentable," that is appropriate subjects for consideration under the provisions of Title 35 U.S.C. § 101.[1] Not only does counsel concede this but it also appears from the evidence that patents have been granted to individuals who have developed processes for producing sodium iodide thallium activated scintillation crystals. (App. I, pgs. 100, 101; App. II, pgs. 1–9). Second, the record demonstrates beyond any doubt that the claimed trade secrets had been in commercial use for more than one year prior to the commencement of this lawsuit. The use of an invention in secret for commercial purposes is considered public use, Huszar v. Cincinnati Chemical Works, 172 F.2d 6 (6th Cir. 1949), and under Title 35 U.S.C. § 102(b), a patent may not issue on an invention which has been in public use or on sale more than one year prior to the date of the application for the patent.[2]

Counsel for Kewanee frankly stated in the course of the arguments before this Court that one of the principle purposes of maintaining the secrecy of inventions, including those here involved, as opposed to seeking patents under the Patent Laws would be to extend the commercial monopoly of the invention beyond the 17 years granted by the Patent Laws.

Therefore, the issue presented to this Court in the instant case may be summarized as follows: Whether a state trade secret law which protects an invention which would be an appropriate

---

1. "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

2. 35 U.S.C. § 102. "A person shall be entitled to a patent unless—(6) the inven-

tion was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

subject for a patent under the Patent Laws of the United States, and which has been used commercially for more than one year conflicts with the policies and purposes of Article I, Section 8 (Clause 8) of the Constitution and the Patent Laws adopted pursuant thereto.

At the outset of our discussion of this subject we recognize that certain other Courts of Appeals have refused to declare a conflict between the United States Patent Laws, on the one hand, and the Trade Secret Laws of certain states, on the other hand, within the meaning of the Supremacy Clause of the Constitution. Servo Corp. of America v. General Electric Co., 337 F.2d 716 (4th Cir. 1964), cert. den. 383 U.S. 934, 86 S. Ct. 1061, 15 L.Ed.2d 851 (1966), rehearing denied 384 U.S. 914, 86 S.Ct. 1333, 16 L.Ed.2d 366 (1966); Dekar Industries, Inc. v. Bissett-Berman Corp., 434 F.2d 1304 (9th Cir. 1970), cert. den. 402 U.S. 945, 91 S.Ct. 1621, 29 L.Ed.2d 113 (1971); Water Services, Inc. v. Tesco Chemicals, Inc., 410 F.2d 163 (5th Cir. 1969); Painton & Co. v. Bourns, Inc., 442 F.2d 216 (2nd Cir. 1971).

To enable us to reach a proper conclusion as to the issue presented and determine whether in fact the patent laws of the United States preempt the field of law relating to monopolies to be granted to inventors, we think it appropriate to probe the background of history which resulted in the inclusion of the patent provision in the Constitution. Our consideration of this historical background is based upon the work of several authorities.[3]

Historians trace the patent privilege at least to the beginning of the 15th Century, but it is clear that the patent protection granted in the early days bore little relationship to the nature of the patent protection contemplated by the Constitution and the Laws of the United States. A patent in its early conception was nothing more or less than a monopoly given to an individual or group of individuals temporarily in favor with the rulers of the country involved. Certainly the granting of the protection of a patent was not for the purpose of preserving to an inventor the right to his invention. Affording to an inventor of an industrial device the protection of the monopoly of a patent may be described as an outgrowth of the Industrial Revolution, and the early limitations provided by the patent statutes of the various industrial countries were as much an attempt to place shackles upon the authority of the Crown as to reward an inventor.

It would appear that there is some basis for a conclusion that the Common Law of England awarded some protection to the inventors of useful devices. Nevertheless, there was no codification of an English patent law until approximately 1787, although the Parliament had earlier placed restrictions upon the Crown's authority to grant patents, and Prager in his work points out (at page 309) that Lord Coke declared an inventors privilege invalid if the monopoly to be protected merely amounted to "a light difference" or "a mere addition" to the then known art.

It appears that some of the American Colonies granted patents prior to the adoption of the Constitution, but it is suggested that most of these patents or

3. H. Toulinin, Handbook of Patents (2nd Ed. 1954); E. Burke Inlow, The Patent Grant, John Hopkins University Studies in Historical and Political Science, V. 67, No. 2, Ch. 2 (1950), Johns Hopkins Press, Baltimore; Frank D. Prager, Historic Background and Foundation of American Patent Law, 5 Am.J.Legal Hist. (1961); Louis Orenbuch, Trade Secrets and the Patent Laws, Journal of the Patent Office Society, Oct. 1970, Vol. 52, No. 10; W. Robinson, The Law of Patents for Useful Inventions (1890). We have also considered some of the material contained in two Law Review articles, "The Limitation on Trade Secret Law Imposed by Federal Patent and Anti-Trust Supremacy," Gordon L. Doerfer, Harvard Law Review, Vol. 80 (1967); "Inventions and the Law of Trade Secrets after Lear v. Adkins," Martin J. Adelman, Robert P. Jaress, Wayne Law Review, Vol. 16 (1969).

monopolies related to the right to produce salt and similar scarce materials for the purpose of insuring a continuing supply. Monopolies, however, were so unpopular that as early as 1641 the Massachusetts Assembly adopted an Act providing in part:

"There shall be no monopolies granted or allowed among us, but of such inventions as are profitable to the Country and that for a short time." Massachusetts, Colonial Laws, I, 244, quoted by Inlow, *supra,* pg. 39.

There were, however, some industrial patents granted which in some instances included grants of land. In 1652 the Massachusetts Assembly granted a patent on what was a real invention, probably a stove. In 1656 this grant was extended for the lifetime of the inventor. There were others for a machine designed to cut grass, and in 1643, John Winthrop, the Younger, was granted a patent or monopoly for an iron foundry with land on which to place it. There were other indicia of similar grants in certain of the Northern Colonies, but in the South only South Carolina seems to have granted the exclusive privilege of mechanical patents including patents in 1732, 1733 and 1756, for rice cleaning machines. The patents described, however, were exceptional and certainly could not be considered as a comprehensive system for the protection of inventors.

During the meetings of the Constitutional Convention there were discussions which resulted in the inclusion of the patent and copyright clause of the Constitution about which James Madison wrote in The Federalist Papers:

"The *fourth* class comprises the following miscellaneous powers:

"1. A power 'to promote the progress of science and useful arts by securing, for a limited time, to authors and inventors the exclusive right to their respective writings and discoveries.'

"The utility of this power will scarcely be questioned. The copyright of authors has been solemnly adjudged in Great Britain to be a right of common law. The right to useful inventions seems with equal reason to belong to the inventors. The public good fully coincides in both cases with the claims of individuals. The States cannot separately make effectual provision for either of the cases, and most of them have anticipated the decision of this point by laws passed at the instance of Congress." No. 43: Madison.

Thus, those who framed and adopted the Constitution of the United States recognized that industrial progress would be enhanced by the protection of the rights of inventors to their inventions, provided that there be a limitation upon the monopoly grant resulting from the issuance of a patent. All of this culminated in the adoption of the first patent law, enacted by the Congress in 1790.[4] This statute provided for a 14 year exclusive grant giving "the sole and exclusive right and liberty of making, constructing, using and vending to others to be used" of any original discovery.

Lacking the protection of a patent early inventors utilized secrecy in order to preserve a monopoly and derive profits from the production of new and improved useful devices, and the history of trade secrets is largely a trail of broken pledges, misplaced confidences, losses and disappointments. The courts did not extend to inventors any substantial protection of such trade secrets. As pointed out by Louis Orenbuch, *supra,* "The restrictions were valuable, trade secrets which were successfully retained for long periods of time were relatively rare." He cites two cases to illustrate the protection: Newbery v. James, 2 Meriv. 446 (1817), where Lord Eldon considered a bill asking for specific enforcement of an agreement concerning medicines alleged to be a trade secret.

4. Annals of Congress, First Congress, Second Session, pg. 2270, 1 Stat.L. 109.

The court refused its aid in preserving the unpatented trade secret. Soon after Newbery v. James came the case of Williams v. Williams, 3 Meriv. 157 (1817), in which a son was alleged to have misappropriated a secret for preparing medicine communicated to him by his father. Lord Eldon, for the Court, again refused to grant protection, and said in part:

"I do not think that the court ought to struggle to protect this sort of secret, in medicine. The court is bound indeed to protect them in cases of patents, to the full extend of what was intended by the grant of the patent, and because the patentee is a purchaser from the public, and bound to communicate his secret to the public."

However, three years later in 1820, Lord Eldon considered the case of Yovatt v. Winyeard, 1 Jc. & W. 394, a suit where an employee had surreptitiously obtained access to the plaintiff's book of recipes, copied them and then started his own medical business. The court granted relief because there "had been a breach of trust and confidence."

Finally, in 1851, the English Chancery Court had before it Morison v. Moat, 9 Hare 231, 20 L.J., Ch. 513, which is considered the leading English case of a legally protectable interest in a trade secret. Vice-Chancellor Turner in Morison v. Moat did not consider the purpose of the patent laws, but enjoined the defendant from the use of the secret without enjoining him from divulging the secret although that relief was asked by the plaintiffs.

The law relating to the protection of trade secrets did not begin to develop in this country until the middle of the 19th Century, and then, as might be expected, the decisions protecting such secrets were handed down by the state courts and were based upon contract. A classic example and one of the earliest cases is Peabody v. Norfolk, 29 Mass. 452 (1868), in which relief was granted to the plaintiffs enjoining the defendant, a former employee, from utilizing machinery and processes which had been communicated to him as trade secrets.

From this beginning the laws of the states which granted protection to trade secrets involving inventions and industrial processes developed. In DuPont Powder Co. v. Masland, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016 (1917), the Supreme Court of the United States approved protection of a trade secret. Mr. Justice Holmes, speaking for the Court, did not approve a property right in a trade secret, but did approve the enforcement of the confidential relationship existing between the plaintiff and the defendant.

This Court in the recent case of W. R. Grace & Co. v. Hargadine, 392 F.2d 9 (6th Cir. 1968), approved protection of trade secrets. Without the numerous citations of cases we suggest that instances of protection of trade secrets by the courts may be found in most of the states of the United States. However, we have been unable to find any case in which there has been a definitive discussion of the possibility of conflict between the Patent Laws of the United States and the trade secret laws of the several states, within the meaning of the Supremacy Clause, and the issue of preemption of the field of protection of inventions by the Patent Laws of the United States has never been directly and clearly presented to the Supreme Court. However, the language of certain early cases *suggests* that the Supreme Court was of the opinion that the Patent Laws provided the exclusive means and remedies for the protection of inventors, and that no other monopoly was available.

In an early patent case, Grant v. Raymond, 31 U.S. (6 Pet.) 218, 8 L.Ed. 376 (1832), Mr. Chief Justice Marshall, in discussing the purposes of the Patent Act, had this to say:

"The great object and intention of the Act is, to assure to the public the advantages to be derived from the discoveries of individuals, and the means it employs are the compensation made

to those individuals, for the time and labor devoted to these discoveries, by the exclusive right to make, use and sell those discovered, for a limited time." *Id.* pg. 243.

That this concept of the patent laws continued to be the view of the Supreme Court is emphasized in Kendall et al. v. Winsor, 62 U.S. (21 How.) 322, 16 L.Ed. 165 (1858). The situation presented to the court in that case was one in which an inventor had withheld making application for a patent until his invention had been perfected and he had had an opportunity to test its value by experiments. An employee copied the invention and made it available to the defendants who continued to manufacture the machine after the plaintiff had obtained letters patent. Mr. Justice Daniel, in discussing the rights of the parties, pointed out in his opinion:

"By correct induction from these truths, it follows, that the inventor who designedly, and with the view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public, *comes not within the policy or objects of the Constitution* or acts of Congress. He does not promote, and, *if aided in his design,* would impede, the progress of science and the useful arts. And with a very bad grace could he appeal for favor or protection to that society which, if he had not injured, he certainly had neither benefitted or intended to benefit." *Id.* pg. 328. (Emphasis supplied).

And in discussing the following instruction to the jury:

"1. That if Aldridge, under a pledge of secrecy, obtained knowledge of the plaintiff's machine—and he had not abandoned it to the public—and thereupon, at the instigation of the defendants, and with the knowledge, on their part, of the surreptitiousness of his acts, constructed machines for the defendants, they would not have the right to continue to use the same after the date of the plaintiff's letters patent.

had this to say at page 331:

"That instruction diminishes or excludes no proper ground upon which the conduct and intent of the plaintiff below, as evinced either by declarations or acts, or by omission to speak or act, and on which also the justice and integrity of the conduct of the defendants were to be examined and determined."

In Kendall et al. v. Winsor, 62 U.S. (21 How.) 322, 16 L.Ed. 165 (1858), Mr. Justice Daniel discusses at some length the intention of the patent laws, the purposes of the patent laws, the rights of the public as distinguished from the rights of the inventor, and the reasons for inserting into the patent laws a duty on the part of the inventor to disclose his invention.

■ Mr. Doerfer in his Law Review article (*supra,* footnote 3) discusses the underlying principles of justification for the patent system and labels it the "exchange for secrets" theory. He points out at page 1441, that in order to promote progress it was not enough that the patent system encourage the development of invention, but it was equally important that inventions not be kept secret. There has been criticism of this theory of the patent law and yet it appears that such is the primary justification for granting a monopoly to an inventor. It thus appears to be well established that the policy of the patent law is to secure protection to the inventor in exchange for the disclosure of the invention at the expiration of the patent. The Supreme Court explained this in Scott Paper Co. v. Marcalus Manufacturing Co., Inc., 326 U.S. 249, 255, 66 S. Ct. 101, 105, 90 L.Ed. 47 (1945), where it was said:

The enactment of these provisions is the mode by which Congress has chosen to carry into effect the policy sanctioned by the Constitution, Article I, § 8, Cl. 8 "To promote the Progress of Science and useful Arts, by securing for limited Times to . . . Inventors the exclusive Right to their

. . . Discoveries." The nature and extent of the legal consequences of the expiration of a patent are federal questions, the answers to which are to be derived from the patent laws and the policies which they adopt. Cf. Sola Electric Co. v. Jefferson Co., 317 U.S. 173, 176, 63 S.Ct. 172, 87 L. Ed. 165; Steele v. L. & N. R. Co., 323 U.S. 192, 204, 65 S.Ct. 226, 89 L.Ed. 173, and cases cited. By the patent laws Congress has given to the inventor opportunity to secure the material rewards for his invention for a limited time, on condition that he make full disclosure for the benefit of the public of the manner of making and using the invention, and that upon the expiration of the patent the public be left free to use the invention. See Special Eequipment Co. v. Coe, 324 U.S. 370, 378, 65 S.Ct. 741, 89 L.Ed. 1006. As has been many times pointed out, *the means adopted by Congress of promoting the progress of science and the arts is the limited grant of the patent monopoly in return for the full disclosure of the patented invention and its dedication to the public on the expiration of the patent."* (Emphasis added.)

The same reasoning is found in Sears Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 229, 230, 84 S.Ct. 784, 788, 11 L. Ed.2d 661 (1964):

The grant of a patent is the grant of a statutory monopoly; indeed, the grant of patents in England was an explicit exception to the statute of James I prohibiting monopolies. Patents are not given as favors, as was the case of monopolies given by the Tudor monarchs, see The Case of Monopolies (Darcy v. Allein), 11 Co. Rep. 84 b., 77 Eng.Rep. 1260 (K.B. 1602), but are meant to encourage invention by rewarding the inventor with the right, limited to a term of years fixed by the patent, to exclude others from the use of his invention. During that period of time no one may make, use, or sell the patented product without the patentee's author-

ity. 35 U.S.C. § 271. But in rewarding useful invention, the "rights and welfare of the community must be fairly dealt with and effectually guarded." Kendall v. Winsor, 21 How. 322, 329, 16 L.Ed. 165 (1859). To that end the prerequisites to obtaining a patent are strictly observed, and when the patent has issued the limitations on its exercise are equally strictly enforced.

Each of these cases involved a conflict between a state law or rule of law and the Patent Law. In Scott Paper Co. v. Marcalus Manufacturing Co., Inc., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945), the question was whether the assignor of a patent was estopped by virtue of his assignment to defend a suit for infringement of the assigned patent on the ground that the allegedly infringed device was that of a prior art expired patent. The Supreme Court held that the doctrine of estoppel, arising out of the contract of assignment, did not apply because such application would be inconsistent with the patent law. In so holding the Court reasoned as follows:

The aim of the patent laws is not only that members of the public shall be free to manufacture the product or employ the process disclosed by the expired patent, but also that the consuming public at large shall receive the benefits of the unrestricted exploitation, by others, of its disclosures. Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 117–120, 59 S.Ct. 109, 83 L.Ed 73. If a manufacturer or user could restrict himself, by express contract, or by any action which would give rise to an "estoppel," from using the invention of an expired patent, he would deprive himself and the consuming public of the advantage to be derived from his free use of the disclosures. The public has invested in such free use by the grant of a monopoly to the patentee for a limited time. Hence any attempted reservation or continuation in the patentee or those claiming under him of the pat-

ent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws.

\*      \*      \*      \*      \*      \*

It is thus apparent that the patent laws preclude the patentee of an expired patent and all others including petitioner from recapturing any part of the former patent monopoly; for those laws dedicate to all the public the ideas and inventions embodied in an expired patent. They do not contemplate that anyone by contract or any form of private arrangement may withhold from the public the use of an invention for which the public has paid by its grant of a monopoly and which has been appropriated to the use of all. The rights in the invention are then no longer subject to private barter, sale, or waiver. Cf. Phillips Co. v. Grand Trunk R. Co., 236 U.S. 662, 35 S.Ct. 444, 59 L.Ed. 774; Midstate Horticultural Co. v. Pennsylvania R. Co., 320 U.S. 356, 361, 64 S. Ct. 128, 88 L.Ed. 96; Brooklyn Bank v. O'Neil, 324 U.S. 697, 704, 65 S.Ct. 895, 89 L.Ed. 1296. It follows that the patent laws preclude the petitioner assignee from invoking the doctrine of estoppel, as a means of continuing as against respondent, his assignor, the benefit of an expired monopoly, and they preclude the assignor from estopping himself from enjoying rights which it is the policy of the patent laws to free from all restrictions. *For no more than private contract can estoppel be the means of successfully avoiding the requirements of legislation enacted for the protection of a public interest.* Compare Pittsburgh, C., C. & St. L. R. Co. v. Fink, 250 U.S. 577, 583, 70 S.Ct. 27, 63 L.Ed. 1151 with Louisiville & Nashville R. Co. v. Mottley, 219 U.S. 467, 476–477; New York Central & H. R. R. Co. v. Gray, 239 U.S. 583, 586–587, 31 S.Ct. 265, 55 L.Ed. 297; Norman v. B. & O. R. Co., 294 U.S. 240, 304–305, 309–310, 55 S. Ct. 407, 79 L.Ed. 885, and cases cited. *The interest in private good faith is not a universal touchstone which can be made the means of sacrificing a public interest secured by an appropriate exercise of the legislative power.* The patent laws preclude us from saying that the patent assignment, which they authorize, operates to estop the assignor from asserting that which the patent laws prescribe, namely, that the invention of an expired patent is dedicated to the public, of which the assignor is a member." 326 U.S. at 255–257, 66 S.Ct. at 104, 105. (Emphasis added.)

In *Sears* the issue was whether a state unfair competition law could, consistently with the United States Patent Laws, protect the copying of an article unprotected by a Federal patent or copyright. In concluding that a state could not grant protection of an unpatented device under the unfair competition law of the state because it would conflict with the policy of the United States Patent Laws, the Supreme Court had the following to say:

*"Just as a State cannot encroach upon the federal patent laws directly, it cannot, under some other law, such as that forbidding unfair competition, give protection of a kind that clashes with the objectives of the federal patent laws.*

In the present case the "pole lamp" sold by Stiffel has been held not to be entitled to the protection of either a mechanical or a design patent. An unpatentable article, like an article on which the patent has expired, is in the public domain and may be made and sold by whoever chooses to do so. What Sears did was to copy Stiffel's design and to sell lamps almost identical to those sold by Stiffel. This it had every right to do under the federal patent laws. That Stiffel originated the pole lamp and made it popular is immaterial. (Emphasis added)

\*      \*      \*      \*      \*      \*

To allow a State by use of its law of unfair competition to prevent the copying of an article which represents

too slight an advance to be patented would be to permit the State to block off from the public something which federal law has said belongs to the public. The result would be that while federal law grants only 14 or 17 years' protection to genuine inventions, see 35 U.S.C. §§ 154, 173, States could allow perpetual protection to articles too lacking in novelty to merit any patent at all under federal constitutional standards. This would be too great an encroachment on the federal patent system to be tolerated.

\*　　\*　　\*　　\*　　\*　　\*

But because of the federal patent laws *a State may not, when the article is unpatented and uncopyrighted, prohibit the copying of the article itself or award damages for such copying.* Cf. G. Ricordi & Co. v. Haendler, 194 F.2d 914, 916 (C.A.2d Cir. 1952). The judgment below did both and in so doing gave Stiffel the equivalent of a patent monopoly on its unpatented lamp. That was error, and Sears is entitled to a judgment in its favor." 376 U.S. 225 (1964) at pgs. 231, 233, 84 S.Ct. 784 at pg. 789 (Emphasis added).

And see also: Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

Even more recently in Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), the Supreme Court in holding that a licensee should not be required to pay royalties while challenging the validity of the patent concluded that requiring such payment would undermine the federal policy favoring full and free use of ideas in the public domain:

"It seems to us that such a requirement would be inconsistent with the aims of federal patent policy. Enforcing this contractual provision would give the licensor an additional economic incentive to devise every conceivable dilatory tactic in an effort to postpone the *day of final judicial* reckoning. We can perceive no reason to encourage dilatory court tactics in this way. Moreover, the cost of prosecuting slow-moving trial proceedings and defending an inevitable appeal might well deter many licensees from attempting to prove patent invalidity in the courts. The deterrent effect would be particularly severe in the many scientific fields in which invention is proceeding at a rapid rate. In these areas, a patent may well become obsolete long before its 17-year term has expired. If a licensee has reason to believe that he will replace a patented idea with a new one in the near future, he will have little incentive to initiate lengthy court proceedings, unless he is freed from liability at least from the time he refuses to pay the contractual royalties. *Lastly, enforcing this contractual provision would undermine the strong federal policy favoring the full and free use of ideas in the public domain.* For all these reasons, we hold that Lear must be permitted to avoid the payment of all royalties accruing after Adkins' 1960 patent issued if Lear can prove patent invalidity." *Id.* at 673–674, 89 S.Ct. at 1913. (Emphasis added.)

The Court said at page 672, 89 S.Ct. at page 1912:

"At the core of this case, then, is the difficult question whether federal patent policy bars a State from enforcing a contract regulating access to an unpatented secret idea."

The Court gave no answer to this question but did say at page 675, 89 S.Ct. at page 1913:

"Our decision today will, of course, require the state courts to reconsider the theoretical basis of their decisions enforcing the contractual rights of inventors and it is impossible to predict the extent to which this re-evaluation may revolutionize the law of any particular State in this regard."

We are now in a position where we find it necessary to answer this question as to that portion of the trade secret laws of the State of Ohio applicable to

this case. Of help is the decision of this Court in Tappan Company v. General Motors Corporation, 380 F.2d 888 (6th Cir. 1967), where in striking down a claim of unfair competition the Court said at page 892:

"In the *Sears, Roebuck* and *Compco* cases the Supreme Court held that the patent provisions (Art. I, § 8, cl. 8) and the Supremacy Clause of the Constitution precluded the individual states from granting protection to articles unprotected by the federal patent laws. Those two cases involved design patents which had been held invalid by lower courts, which nevertheless granted relief on the basis of state unfair competition law. The Supreme Court reversed those determinations, reasoning that the force of the Supremacy Clause, as well as the need for uniform standards of protection, required that the federal decision on these matters remain the sole measure of the rights of the competitors.

In the present case the District Court based its judgment on the theory that *Sears, Roebuck* and *Compco* extended even to cases where the patent had not yet been invalidated and still retained its statutory presumption of validity. While we think it would have been better to practice for the District Court to have deferred ruling on this count until after deciding the issues of validity and infringement of the patents, we find no prejudice has resulted to appellant from the Court's premature disposition of this matter.

The question, as stated in the first sentence of the *Sears, Roebuck* case is whether state law may grant relief to the owner of a design or article which is not *protected* by a federal patent or copyright. For our purposes it is important to point out that a design or article may be deprived of such protection for one of two reasons * * * either it may not qualify for a patent or copyright at all (initially at the Patent Office, or upon later judicial determination) or, as happened here, it may be found that the specific infringement against which relief is sought, does not in fact impinge upon the plaintiff's rights. Thus, in our case, the District Court found that the Fabulous 400 was not entitled to patent protection against the marketing of the Flair line produced by defendants. In this sense, the federal decision that no protection is warranted is the same whether it is based on a finding of patent invalidity, as in *Sears, Roebuck,* or on a finding of noninfringement as in our case.

To allow relief under state law in either situation would run counter to the paramount federal decision of nonprotection. See Columbia Broadcasting System, Inc. v. DeCosta, 377 F.2d 315 (1st Cir. 1967)."

See also Bendix Corporation v. Balax, Inc., 421 F.2d 809 (7th Cir. 1970), cert. denied 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1970), and Massillon-Cleveland-Akron Sign Co. v. Golden State Advertising Co., 444 F.2d 425 (9th Cir. 1971).

■ Thus, we feel compelled to conclude that a state trade secret law which protects an inventor in the maintenance of a monopoly of a device which is an appropriate subject for patent under the United States Patent Laws is in conflict with the policies and purposes of those patent laws where the invention has been used commercially for more than one year. By such use the inventor has forfeited his right to a patent but by the use of the state trade secret law he is able to exclude competition and prevent disclosure, thus obtaining protection which he could not obtain under the laws of the United States. The state trade secret law has no limitation of time and, therefore, is in direct conflict with the Patent Laws, which have as a purpose the objective of obtaining public disclosure after a limited period of time.

■ We recognize that our holding in this case is in conflict with the previously cited decisions of other Circuits, Servo Corp. of America v. General Electric

Co., 337 F.2d 716 (4th Cir. 1964), cert. den. 383 U.S. 934, 86 S.Ct. 1061, 15 L. Ed.2d 851 (1966), rehearing denied 384 U.S. 914, 86 S.Ct. 1333, 16 L.Ed.2d 366 (1966); Dekar Industries, Inc. v. Bissett-Berman Corp., 434 F.2d 1304 (9th Cir. 1970), cert. den. 402 U.S. 945, 91 S. Ct. 1621, 29 L.Ed.2d 113 (1971); Water Services, Inc. v. Tesco Chemicals, Inc., 410 F.2d 163 (5th Cir. 1969); Painton & Co. v. Bourns, Inc., 442 F.2d 216 (2nd Cir. 1971), but our analysis of the relationship between the Patent Laws of the United States and the Trade Secret Laws of the State of Ohio, as applied in this case, forces us to the conclusion that the field of protection afforded to this plaintiff by that Trade Secret Law has been preempted by the Patent Laws of the United States. We, therefore, hold that the Trade Secret Laws of the State of Ohio may not afford to the plaintiff in this case protection which the plaintiff could not obtain under the Patent Laws.

The judgment for the plaintiff-appellant is reversed and the case is remanded to the District Court for dismissal of the complaint.