**DATAMEDIA COMPUTER SERVICE, INC., Plaintiff-Appellant,**

v.

**AVM CORPORATION and Shoup Voting Machine Corporation, Defendants-Appellees.**

**No. 30283.**

United States Court of Appeals, Fifth Circuit.

April 19, 1971.

Rehearing Denied May 18, 1971.

---

Jay M. Vogelson, Paul H. Stanford, William VanDercreek, Akin, Steinberg & Stanford, Dallas, Tex., for plaintiff-appellant.

Harold Hoffman, Morris I. Jaffe, Jerry L. Buchmeyer, Schuyler B. Marshall, Dallas, Tex., for defendants-apellees; Thompson, Knight, Simmons & Bullion, Dallas, Tex., of counsel.

Before COLEMAN, SIMPSON and RONEY, Circuit Judges.

COLEMAN, Circuit Judge:

In the District Court for the Northern District of Texas Datamedia Computer Service, Inc. filed a Sherman Anti-Trust Act suit against two competing voting machine companies, AVM Corporation and Shoup Voting Machine Corporation. The venue was challenged, Section 12 [1] of the Clayton Act and 28 U.S.C. Section 1391.[2] The District Court appointed a special master to supervise the discovery of venue facts. Upon completion of discovery proceedings, a hearing was held and the complaint was dismissed for lack of venue. Datamedia appeals. We reverse, and remand the case for trial on the merits.

## I

### *The Law*

Section 12 of the Clayton Act confers venue for antitrust suits upon any district in which the defendant corporation is transacting business.

The test for transacting business under Section 12 was set forth in Eastman Kodak Company v. Southern Photo Materials, 1927, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684. The Court stated "that a corporation is engaged in transacting business in a district * * * if in fact, in the ordinary and usual sense, it 'transacts business' therein of any substantial character." This decision effectively broadened the venue of the district court in anti-trust suits.

It is best demonstrated by the Court itself in United States v. Scophony Corporation of America, 1948, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091:

"Thus by substituting practical, business conceptions for the previous

---

1. 15 U.S.C.A. § 22. *District in which to sue corporation.*

   Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in in the district of which it is an inhabitant, or wherever it may be found.

2. 28 U.S.C.A. § 1391. *Venue generally*

   (a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside.

   (b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, except as otherwise provided by law.

   (c) A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes.

   (d) An alien may be sued in any district.

hair-splitting legal technicalities entrusted upon the 'found'—'present'—'carrying-on-business' sequence, the Court yielded to and made effective Congress' remedial purpose. Thereby it relieved persons injured through corporate violations of the anti-trust laws from the often insuperable obstacle of resorting to distant forums for redress of wrongs done in the places of their business or residence. A foreign corporation no longer could come to a district perpetrate there the injuries outlawed, and then by retreating or even without retreating to its headquarters defeat or delay the retribution due."

In Jeffrey-Nichols Motor Company v. Hupp Motor Car Corporation, 1 Cir., 1931, 46 F.2d 623, Hupp had district managers who promoted and solicited sales in much the same manner as AVM's agents. The Court had this to say about transacting business:

"Under the rule laid down in the Eastman Company case, while a single transaction of business may not be sufficient to establish a venue in a district, it does not require the maintenance of an office or place of business or the presence of agents soliciting or taking orders. * * * The sale of goods is not essential to constitute transacting business. All the steps leading up to or in promoting sales may constitute the transaction of business."

In Green v. United States Chewing Gum Mfg. Company, 5 Cir., 1955, 224 F.2d 369, we held:

"It will not do to deny substantiality by replying, as said defendant does in its President's affidavit, that '* * * the gross business of United States Chewing Gum Mfg. * * * represented by shipments to these two companies * * * is a very small part of the total business of my company', for if that were the rule, we would have different tests of substantiality applying to different corporations according to their size; a large corporation could, with impunity, engage in the same acts which would subject a smaller corporation to jurisdiction and venue. We agree with Judge Allan K. Grim of the Eastern District of Pennsylvania that the test is rather, whether or not the sales would appear to be substantial from the average businessman's point of view. Sunbury Wire Rope Manufacturing Company v. United States Steel Corporation, E.D.Pa., 1955, 129 F.Supp. 425, 427."

## II

### The Facts

#### A. AVM

AVM is a Delaware Corporation with its principal place of business in Jamestown, New York. It maintains no office or place of business in the Northern District of Texas, nor does it have any employee or agent residing in the district. AVM Corporation and its predecessors have been in the voting machine business since 1895. It is the largest producer of voting machines in this Country. It existed as Automatic Voting Machine Corporation from 1925 to 1958, when it was acquired by Rockwell Manufacturing Company. AVM was operated as a division of Rockwell until 1964, when it became a separate entity as a Rockwell spinoff.

Since 1936 AVM, or its direct predecessors, have made numerous sales of voting machines in the Northern District of Texas. M. O. Doolittle, Executive Vice-President of AVM, admitted in deposition that AVM, or its predecessors, sold within the forum district forty-four voting machines in 1936, one hundred twenty machines in 1940, one hundred fifty machines in 1946, seventy-five machines in 1952, seventy-five machines in 1960, and one hundred voting machines in 1963. As indicated by the dates the sales have generally occurred in Presidential election years or in the so-called "off-year" elections. The largest volume of sales has occurred in the Presidential election years.

AVM's sales in the forum district declined after the Presidential election year

of 1964. In this year AVM sold to Dallas County one hundred voting machines at a price of $179,200. Since that time AVM has sold within the forum district only one used voting machine for a price of $1500. In addition to this sale AVM submitted a bid to Dallas County for the sale of four hundred eighty six voting machines at a price of $1,019,628, less rental credit of $45,000. However, this bid was unsuccessful, since the contract was awarded to Datamedia Corporation on a bid of $260,400. Had AVM received the Dallas County award that sale would have represented approximately 10% of its gross sales of $9,600,000 for 1968.

Though AVM has made only one sale in the forum district since 1964, it has continued to solicit business in the area. The Corporation employed Bert Evans in 1967 as the Manager for the Southwest Region, which includes the forum district. His job was to solicit voting machine sales. During 1967 and 1968 Evans made 37 business trips to the forum district, which resulted in the sale of the used voting machine in 1968. Prior to this time Harold Green had been employed by AVM as a resident agent in the forum district in 1965 and 1966. He did not sell any voting machines, but received $33.00 commission for the machine Evans sold in 1968.

In the years 1967 and 1968 AVM's agents or representatives made 49 separate business trips for a total of 81 days to the Northern District of Texas. In addition to these trips Joseph M. Shelton appeared twice before the Dallas County Commissioner's Court. At these appearances he pointed out alleged shortcomings of Datamedia's machines and recommended AVM's machines to the Court.

Finally, AVM's Product Manager, A. V. Martin, makes at least one stop a year in Dallas County to check on any problems the County has with the machines. Pursuant to these problems AVM has conducted $3,226.17 worth of repair services from 1963 through 1967.

The above is the sum total of AVM's business activities within the Northern District of Texas. When analyzing these activities it must be remembered that the voting machine business is unusual in that most sales are made only every two years with the largest volume every four years. In such an industry solicitation is an essential element. It is readily apparent that AVM could not pop in on potential customers once every two or four years and hope to compete.

### B. *Shoup*

Shoup Voting Machine Corporation and its predecessors have been engaged in the voting machine business since 1893. The Company was known as the Shoup Company and did not sell its first voting machine until 1927. In 1929 the Company was incorporated in New Jersey.

In 1931 or 1932 a new company incorporated in Delaware as the Shoup Voting Machine Corporation. This corporation acquired the voting machine rights from the Shoup Company for which they paid royalties for seventeen years. Shoup Voting Machine Corporation was taken over by different persons and reincorporated in New York in 1954. This lasted for two years until General Battery Corporation acquired Shoup in 1956. General Battery operated Shoup until 1965 when it was sold and incorporated in Pennsylvania as the Shoup Voting Machine Company. This is its present status.

Shoup began its business activities in the forum district in 1963. In this year Shoup submitted to Potter County a bid to provide eighty to one hundred ten voting machines at $1,723 each. In May, 1964, Shoup supplied Tarrant County with 430 voting machines for a one year rental of $21,500 on a lease-purchase agreement. It is undisputed that in 1965 Tarrant County exercised its purchase option and bought the machines for $691,440, less rental. Also, in August, 1964, Shoup supplied Tarrant County with twenty additional machines on the same lease-purchase agreement. Again it is undisputed that Tarrant County exercised their option in 1965 and purchased the machines for $32,160, less

rental. Since 1965 the only sales made by Shoup in the forum district were $430 for parts in 1966, $430 for parts in 1967, and $4,635 for parts in 1968. However, in July, 1968, Shoup submitted to Tarrant County a bid for one hundred voting machines at a purchase price of $1,823 per machine. This bid was unsuccessful.

Shoup retains Jim Dulaney Machinery Company of San Antonia as an independent sales representative. Dulaney has made no sales in the forum district. In 1968, Dulaney wrote letters to counties within the district, but these were not answered. Although it is clear that Shoup's agents or representatives made several trips to the forum district from 1964–1968, the exact number for each year is not ascertainable. Some of the trips claimed by the appellant in fact included trips made to other places outside of the Northern District of Texas.

In 1967, Ransom Shoup, an officer of Shoup Voting Machine Corporation, appeared before the Dallas County Commissioner's Court to attempt to sell Shoup machines to Dallas County at some future date. At this meeting he testified that Shoup could not submit a bid to Dallas County because it did not manufacture a large enough machine.

### III

### *The Decision*

We are here dealing with an industry which, by its very nature, makes sales, and can expect to make sales, only at intervals, governed largely by the periodical nature of the electoral process. Between times it must remain active to secure business as it arises. Thus the facts must be evaluated in that context.

Appellees contend that the decision of the District Court rested upon its findings of fact, hence the finding that AVM and Shoup were not transacting business in the district when the suit was filed is entitled to shelter of the "clearly erroneous" umbrella. Hillard v. C. I. R., 5 Cir., 1960, 281 F.2d 279, does not support this view. We there held:

"This Court is, of course, freed from the clearly erroneous rule where there is no conflict as to the evidence and the question becomes one as to the legal inferences to be drawn from undisputed facts."

From the facts hereinabove enumerated we are entirely persuaded that this case falls within the teachings of Jeffrey-Nichols, *supra*, and United States Chewing Gum, *supra*. It necessarily follows, in our opinion, that both appellees were transacting business in the Northern District of Texas within the meaning and purport of Section 12 of the Clayton Act at the time this suit was filed.

Accordingly, the judgment of the District Court is reversed and the case remanded for trial on the merits.

Reversed and remanded.