594 F.2d 453
 CARSON PRODUCTS COMPANY, Plaintiff-Appellant,
v.
Joseph A. CALIFANO, Jr., Secretary of the Department of
Health, Education and Welfare, and Donald Kennedy,
Commissioner of Food & Drugs, Food &
Drug Administration,
Defendants-Appellees.
 No. 77-1603.
 United States Court of Appeals,
Fifth Circuit.
 May 4, 1979.
 
 Ralph O. Bowden, III, Robert S. Glenn, Jr., Savannah, Ga., for plaintiff-appellant.
 William T. Moore, Jr., U. S. Atty., Augusta, Ga., John H. Shenefield, Charles R. McConachie, Benjamin P. Schoen, Attys., Consumer Affairs Section, Antitrust Division, U. S. Dept. of Justice, Washington, D. C., Richard A. Merrill, Chief Counsel, Stuart M. Pape, Associate Counsel, Arnold I. Friede, Asst. Counsel, Food and Drug Admin., Rockville, Md., Henry L. Whisonhunt, Jr., Asst. U. S. Atty., Augusta, Ga., for Califano.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before THORNBERRY, CLARK and RONEY, Circuit Judges.
 CHARLES CLARK, Circuit Judge:
 
 
 1
 This appeal concerns the efforts of the Carson Products Company to have an ingredient in one of its cosmetics products exempted from federal disclosure requirements as a trade secret. Carson raises a due process challenge to the procedures used by the Food and Drug Administration to determine the trade secret status of the ingredient, and it attacks on the merits the FDA's determination that the ingredient is not a trade secret. We affirm. Carson was afforded due process. The FDA's action denying trade secret status for the Carson ingredient was based on substantial evidence and was not arbitrary or capricious.
 
 I.
 
 2
 The Carson Products Company manufacturers "Gold Magic Shaving Power." Gold Magic is a "depilatory," a substance used for the removal of hair. The shaving powder is mixed with water and used to remove hair as an alternative to shaving. It has been successful on the market, particularly with black males, who frequently experience special skin irritation problems from shaving with a razor.
 
 
 3
 Under the Fair Packaging and Labeling Act, 15 U.S.C. §§ 1451 Et seq., the Secretary of Health, Education and Welfare is authorized to promulgate regulations for the public disclosure of the ingredients of consumer products. 15 U.S.C. § 1454. Pursuant to section 5(c)(3)(B) of the Act, 15 U.S.C. § 1454(c)(3)(B), the FDA has issued regulations providing that "The label on each package of a cosmetic product shall bear a declaration of each ingredient in descending order of predominance." 21 C.F.R. § 701.3(a). Only the names of the ingredients in the order of volume used in the product need be declared; nothing in the Act or the regulations requires the disclosure of percentages or quantity levels of particular ingredients.
 
 
 4
 The Act expressly states that its disclosure requirements shall not "be deemed to require that any trade secret be divulged." 15 U.S.C. § 1454(c)(3) (B). In accordance with that statutory caveat, the FDA regulations exempt from mandatory disclosure any ingredient certified by the FDA as a trade secret. 21 C.F.R. § 2061(a). If the ingredient qualifies as a trade secret it may be referred to on the product package with the phrase "and other ingredients." 21 C.F.R. § 701.3(a).
 
 
 5
 On March 19, 1973, Carson asked the FDA to declare one of the ingredients in Gold Magic, referred to here by the pseudonym "05,"[1] a trade secret exempt from disclosure. Ingredient 05 is included in Gold Magic to offset two problems that had previously prevented widespread public acceptance of depilatories for removal of facial hair. One problem was that the ingredients traditionally used in depilatories tended to produce an unpleasant odor; a second problem was that the depilatory action of those ingredients was not fast enough to work upon a man's beard within a reasonable time. After five years of research at a cost of $350,000, Carson discovered that the inclusion of ingredient 05 in its product resulted in a fast-acting depilatory with a pleasant scent. Although ingredient 05 itself has depilatory properties, its primary function in Gold Magic is to act as an accelerator for the main depilatory in the product, calcium thioglycolate.[2] Carson explained both the research history and the competitive advantages of ingredient 05 in its submission to the FDA, and further asserted that none of its competitors appeared to know of its presence in Gold Magic.[3]
 
 
 6
 On August 19, 1974, the FDA denied trade secret status for ingredient 05 with the statement that "scientific and technical literature in the field of cosmetics indicate that this type of ingredient is used in the formulation of this type of cosmetic product." The FDA letter cited a single article from a scientific journal to support its position that the use of ingredient 05 in products such as Gold Magic had been previously disclosed.[4]
 
 
 7
 Carson administratively appealed the FDA decision, presenting written response to the FDA's interpretation of the scientific literature cited by the agency. On January 2, 1975, the FDA again denied Carson's request. In addition to the article previously relied on by the FDA, the agency cited two foreign patents as examples of disclosure of the use of ingredient 05. The letter stated that: "It is entirely possible that some competitors are not aware of this specific use of this ingredient, and that no other depilatory presently uses it. In our judgment, this is not sufficient for it to be determined to be a trade secret in view of its mention in the public literature." Carson asked the FDA on May 20, 1975, to reconsider its decision, submitting a written rebuttal to the significance of the two foreign patents cited by the agency in its January 2, 1975, letter. The FDA took the position that the January 2, 1975, denial constituted final agency action which could not be reconsidered pursuant to FDA regulations, and it refused to reopen the matter.
 
 
 8
 Still unwilling to concede, Carson resubmitted its products statement to the FDA on May 20, 1975, arguing that the FDA was free to reconsider any matter at any time either at its own initiative or at the behest of any interested person. Carson did not submit any additional substantive arguments concerning ingredient 05 with its request, but relied on all its past written submissions concerning its interpretation on the sources cited by the FDA.
 
 
 9
 In its response on December 4, 1975, the FDA stated that it had reconsidered the issue "in its entirety," including all prior written submissions made by Carson concerning the sources that had been previously cited by the FDA. The FDA concluded that "(a)fter reconsidering all data and information submitted," ingredient 05 did not qualify as a trade secret. The letter stated that its conclusion was "based on the reasons set forth in our letter of January 2, 1975."
 
 
 10
 Carson filed suit in the District Court for the Southern District of Georgia challenging the FDA's determination that ingredient 05 was not entitled to classification as a trade secret. On cross motions for summary judgment, the district court found against Carson, holding that as a matter of law the FDA's action was based on substantial evidence and was not arbitrary or capricious. See 5 U.S.C. § 706(2)(A), (E). On appeal Carson challenges the district court's judgment on the merits, and raises for the first time a due process attack on the procedures followed by the FDA.
 
 II.
 
 11
 Carson alleges that the procedures utilized by the FDA to evaluate Carson's trade secret claim violated due process. Carson relies primarily on a recent decision by the United States District Court for the District of Columbia, Zotos International, Inc. v. Kennedy, 460 F.Supp. 268 (D.D.C., 1978), in which the FDA's procedural regulations for handling trade secret claims were held to fall below the minimum constitutional requirements of the due process clause. Zotos was decided after the judgment was rendered by the district court in this action and after the initial briefs were filed by the parties on appeal. Both sides have filed supplemental briefs discussing the significance of Zotos.
 
 
 12
 A court of appeals has discretion to hear an issue not raised before the district court in exceptional circumstances where injustice might otherwise result. Hormel v. Helvering, 312 U.S. 552, 556-57, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941); D. H. Avermyer Co. v. Loflin, 440 F.2d 1213, 1215 (5th Cir.), Cert. denied, 404 U.S. 851, 92 S.Ct. 87, 30 L.Ed.2d 90 (1971). "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). We find the circumstances of Carson's case sufficiently exceptional to warrant a decision on its due process challenge on this appeal.
 
 
 13
 Zotos has had a sweeping impact on the FDA's management of trade secret claims. The agency chose not to appeal the Zotos decision to the Court of Appeals for the District of Columbia, but rather to modify all pertinent procedures to bring them in compliance with the principles set forth in that decision. The FDA began implementation of its modified procedures by applying them to all confidentiality requests which were pending before it at the time of the Zotos decision. The agency also decided to reopen and apply the new procedures to all confidentiality requests which were denied by the FDA and appealed to a district court, where no action had yet been taken by the district court. Only in cases such as Carson's, where the agency has denied a trade secret claim and a district court has affirmed the agency's determination, did the FDA not voluntarily agree to reevaluate trade secret requests under its modified procedures.
 
 
 14
 Zotos marked a dramatic change in the legal climate surrounding trade secret claims before the FDA, a change that occurred in the interegnum between the decision of the district court and our decision on appeal. Resolution of Carson's due process complaint does not involve any disputed factual issues; the record on appeal sets forth the procedures applied by the FDA to Carson's case and the question of whether those procedures comport with due process is purely legal. We are as fully competent to decide that question as would have been the district court, and the district court's decision, had it been made, would not have been entitled to the deference of the clearly erroneous standard which is given factual determinations. E. g., Data-media Computer Service, Inc. v. AVM Corporation, 441 F.2d 604, 608 (5th Cir. 1971); Caradelis v. Refineria Panama, S. A., 384 F.2d 589 (5th Cir. 1967); Hillard v. Commissioner of Internal Revenue, 281 F.2d 279, 282 (5th Cir. 1960). The government has fully briefed the due process issue, and is at no disadvantage at having the question passed on for the first time here. In light of the great deference which the FDA itself has shown Zotos, it would be manifestly unfair not to allow Carson an opportunity to invoke Zotos on this appeal.
 
 
 15
 The Zotos case involved the request of the Zotos International Corporation to the FDA for trade secret certification for part of the contents of a cosmetic hair product manufactured by Zotos. Zotos claimed trade secret status for the combination of two ingredients used in its product. The FDA rejected the request, stating that the first ingredient was "much-referenced" and "widely used" in hair products. The agency cited five publications in support of its statement. As to the second ingredient, the FDA cited three publications and a foreign patent as evidence of prior public disclosure. The agency also concluded that the concept of using the two ingredients in combination was "not new," citing three patents and a German publication for support.
 
 
 16
 Zotos formally petitioned the FDA for reconsideration, submitting to the agency a rebuttal concerning the sources cited by the FDA. Zotos argued that the patents and publications relied on by the agency described the combinative use of chemicals whose compositions were similar, but not identical, to those of the chemicals employed by Zotos, and that the substances produced did not have the beneficial effects which the combination used by the Zotos product had. Zotos claimed that even if the attributes of the two chemicals it used were generally known and the concept of reading them together was previously established, "it would require literally thousands of experimentations" to arrive at the precise formulation so beneficially employed by Zotos. The FDA responded to the Zotos request for reevaluation by stating:
 
 
 17
 We have reviewed the data and information provided as attachments and reconsidered your petition. We must reaffirm our earlier conclusion that the information for which you requested exemption from public disclosure cannot be accepted in confidence for the reasons stated in our letter of denial of December 23, 1976. The petition has failed to convince us that relevant data, information or views contained in the administrative record were not adequately covered. It merely restates the same grounds in the original request for exemption from public disclosure.
 
 
 18
 On judicial review the district court held that the procedures employed by the FDA did not comport with due process. The court noted that although the FDA procedures are not conducted under any of the provisions of the Administrative Procedure Act, the informal rulemaking provisions of section 553 of the Act, 5 U.S.C. § 553, constituted a useful guide in evaluating the adequacy of the FDA procedures. The court found that the brief exchange between Zotos and the FDA concerning the meaning of the sources relied on by the agency did not offer Zotos a chance to engage "in a reasonably focused dialogue with the agency." (Manuscript op. at 13.) The court stated:
 
 
 19
 This brief exchange created serious practical disadvantages for Zotos. The question of whether a chemical formula is known to the public may involve information largely outside the petitioner's bailiwick, but scientific debates about the significance of that information may rage nevertheless. The complex nature of trade secret and patent litiation, and the extended opportunitities provided by the Rules of the U.S. Patent Office to rebut and re-argue adverse findings De novo, further belie the laymen's belief that scientific controversies are "objectively resolvable" in any simple sense of the terms.
 
 
 20
 In this case, the FDA ranged far to gather evidence which, it believed, established a lack of trade secrecy for Zotos' product. An article in a German publication was found, as well as a French patent. Zotos could have not possibly have guessed which authorities the FDA would come to consult, or the scientific issues these authorities would raise. Before the agency revealed its "final" decision on December 23, it did not disclose "the facts and assumptions" on which it intended to rely, to quote the terms supplied by Chief Judge Wright. There was no "effective chance to respond to crucial facts," to quote the words of Professor Davis. The "notice" Zotos had of the FDA's proposed action was limited to the fact that 15 U.S.C. § 1454 and the agency's implementing regulations mandate the disclosure of cosmetic ingredients which are not trade secrets. This degree of notice fell far short of what is typically provided in § 553 rulemaking.
 
 
 21
 (Manuscript op. at 17-18.)
 
 
 22
 We are in substantial agreement with the legal principles articulated in Zotos. "The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and the opportunity to meet it.' " Mathews v. Eldridge, 424 U.S. 319, 348, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976), Quoting Joint Anti-Facist Comm. v. McGrath, 341 U.S. 123, 171-72, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1950) (Frankfurter, J., concurring). It is a fundamental proposition of administrative law that interested parties must have an effective chance to respond to crucial facts. See Davis, Administrative Law of the Seventies, § 6.01-3 (1976). The opportunity for response must come "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). In the particular context of trade secret certification by the FDA, the proprietor of the alleged trade secret must be allowed to respond to the sources cited by the agency with an opportunity for meaningful agency review of that response before the FDA determination becomes final.
 
 
 23
 Applying these principles to the record before us, we find that the treatment accorded Carson by the FDA met the minimum threshold requirements of due process. In one crucial respect, the FDA handled the Carson submission differently from the situation in Zotos. Unlike Zotos, Carson received a complete reevaluation of its trade secret request in light of the written rebuttal statements submitted by Carson concerning the cited FDA sources. The FDA explicitly told Carson in its final rejection letter that it had reconsidered the request "in its entirety" and that it had "reconsidered all data and information" provided by Carson. Although Zotos was also allowed to submit rebuttal arguments to the FDA concerning disclosure sources, the agency did not give meaningful reconsideration to the rebuttal submission. The final FDA rejection letter to Zotos declared that the Zotos rebuttal:
 
 
 24
 failed to convince us that relevant data, information or views contained in the administrative record were not adequately covered. It merely restates the same grounds in the original request for exemption from public disclosure.
 
 
 25
 As the Zotos court noted, the final FDA response was a conclusory adherence to a prior determination; it did not evidence genuine reconsideration, but merely a conclusion that complete reevaluation was not called for.
 
 
 26
 Had the FDA in Carson's case adhered to its original determination on January 2, 1975, that it could not reevaluate Carson's request, including an evaluation of its rebuttal statements, the FDA's action would not have satisfied due process. In deciding to reconsider Carson's entire case after its May 20, 1975, petition, however, the FDA took a significant step that it failed to take in Zotos. By reevaluating Carson's request in light of those rebuttal statements, Carson was afforded two essentials of due process: notice of the case against it and a meaningful opportunity to respond.[5]
 
 
 27
 The meaningful response afforded Carson, however, did not cover all the sources on which the FDA has attempted to rely on in support of its action on judicial review. Of the six sources cited by the FDA to the district court below, only three those designated in the record as exhibits B, E and F were previously cited to Carson in the FDA rejection letters. Those three sources were the only sources which Carson had an opportunity to evaluate and attempt to rebut before the agency. In assessing the validity of the FDA's determination against Carson on the merits, we therefore limit our consideration to those three sources in the record on which Carson and the FDA previously exchanged meaningful dialogue.
 
 III.
 
 28
 Carson's position on the merits is not unsympathetic. It is a relatively small firm that developed ingredient 05 after expending considerable energy and money. Competitors have apparently not yet discovered the identity of the ingredient, and Carson is understandably reluctant to yield the advantage procured at its own hard initiative because of public references to the ingredient that it regards as oblique and obscure. We have, however, examined the sources relied on by the FDA in its rejection letters to Carson[6] and we agree with the conclusion of the district court that those sources constitute substantial evidence supporting the agency's actions, and that the FDA was not arbitrary or capricious in finding that the disclosure contained in the sources was sufficient to destroy the trade secret status of ingredient 05.
 
 A.
 
 29
 At the outset we are met by a vigorous disagreement between the parties as to the proper scope of review of the FDA's actions. Carson argues that since the content of the sources cited by the FDA is not in dispute, the agency's determination on the merits was purely a question of law. As such, Carson argues, the FDA's action is not entitled to the usual deference shown to administrative agencies. See A. O. Smith Corporation v. Petroleum Iron Works, 73 F.2d 531 (6th Cir. 1934). The government responds by stating that although the identity and literal content of the FDA's sources are not in dispute, the proper interpretation of what those sources disclosed is a matter of factual disagreement. The district court did not attempt to characterize the issue before it as either factual or legal, but simply applied the conventional standards of review under the "substantial evidence" and the "arbitrary and capricious" tests of the APA. 5 U.S.C. § 706(2)(A), (E). See generally, Davis, Administrative Law of the Seventies § 29.00 (1976); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971).
 
 
 30
 It belies common sense to regard the complex scientific battle of experts waged before the district court as a question of law. In truth, the parties do not dispute any aspect of the applicable legal standards under the substantive law of trade secrets, but only whether the literature and patents relied on by the FDA are sufficiently akin to Carson's product to constitute disclosure under those legal standards. Although the question is imbued with both legal and factual qualities, it is primarily a matter of technical judgment. The key issue is whether a competitor could examine the FDA sources and readily ascertain Carson's alleged secret. The resolution of the issue necessarily turns on a scientific determination of the content of the sources and the significance of that content to a trained cosmetic chemist seeking to discover the ingredients of Gold Magic. The district court applied the correct standard of review in making that determination. "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park, supra, 401 U.S. at 416, 91 S.Ct. at 824.
 
 B.
 
 31
 Although the Fair Packaging and Labeling Act unequivocally exempts trade secrets from its disclosure requirements, 15 U.S.C. § 1454(c)(3)(B), the Act itself does not define the term. Drawing on the gloss of the common law, the FDA in 21 C.F.R. § 20.61(a) has promulgated a definition of trade secret derived verbatim from the Restatement of Torts, § 757 Comment (b) (1939). The regulation reads:
 
 
 32
 A trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.
 
 
 33
 The agency has accepted the factors listed in the Official Comment to Restatement § 757 as the relevant criteria for determining whether an ingredient satisfies the definition of trade secret. 39 Fed.Reg. 44613 (December 24, 1974). The Restatement Comment states that:
 
 
 34
 An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) The extent to which the information is known outside his business; (2) The extent to which it is known by employees and others involved in his business; (3) The extent of measures taken by him to guard the secrecy of the information; (4) The value of the information, to him or his competitors; (5) The amount of effort or money expended by him in developing the information; (6) The ease or difficulty with which the information could be properly acquired or duplicated by others.
 
 
 35
 Restatement of Torts, Comment (b) at 5.
 
 
 36
 The FDA has never disputed that Carson has taken substantial precautions to guard the secrecy of ingredient 05, that knowledge of the ingredient is restricted within the Carson Company, that knowledge of the ingredient is competitively valuable to Carson and would be to its competitors, or that Carson developed the use of ingredient 05 after substantial effort and expense. The agency's sole grounds for denying ingredient 05 trade secret status is its alleged public disclosure in scientific literature and foreign patents.
 
 
 37
 However strong may be Carson's case on the other indicia of trade secret status, it is elemental that "The subject matter of a trade secret must be secret." Cataphote Corporation v. Hudson, 422 F.2d 1290, 1293 (5th Cir. 1970), subsequent opinion after remand, 444 F.2d 1313 (1971). The subject of a trade secret "must not be of public knowledge or of a general knowledge in the trade or business." Kewanee Oil Company v. Bicron Corporation, 416 U.S. 470, 475, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974). The Restatement declares that "a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information." Restatement of Torts, § 757 Comment (b) at 6.
 
 
 38
 A trade secret differs fundamentally from a patent in that a patent is information which gains legal protection precisely because it is made public. A patent is "totally exclusionary for the period for which (it is) granted," Cataphote, supra, 422 F.2d at 1293, and "(i)n return for the right of exclusion this 'reward for inventions' the patent laws impose upon the inventor a requirement of disclosure." Kewanee Oil, supra, 416 U.S. at 480, 94 S.Ct. at 1886 (citation omitted). "When a patent is granted and the information contained in it is circulated to the general public and those especially skilled in the trade, such additions to the general knowledge are of such importance to the public weal that the Federal Government is willing to pay the high price of 17 years exclusive use for its disclosure." Id. at 481, 94 S.Ct. at 1886.
 
 
 39
 Since the proprietor of a trade secret does not engage in the quid pro quo of exclusion for disclosure, a trade secret is entitled to legal protection only to the extent that it is not discoverable by fair and honest means. Id. at 476, 94 S.Ct. at 1883. Information cannot be the subject of a trade secret if it is readily ascertainable without engaging in tortious behavior. "The protection is merely against breach of faith and reprehensible means of learning of another's secret." Restatement of Torts, § 757 Comment (b) at 7. A trade secret forfeits its protection if discovered by means such as "independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture." Kewanee Oil, supra, 416 U.S. at 476, 94 S.Ct. at 1883. On the other hand, if a trade secret is discovered by improper means, "which may include theft, wiretapping, or even aerial reconnaissance," Id., that disclosure does not disqualify it from legal protection. Under this analysis, information that has been divulged in a published article or in publicly filed patents[7] cannot be the subject of a trade secret.
 
 C.
 
 40
 Carson maintains that the three sources relied on by the FDA do not disclose the exact information about Gold Magic that Carson regards as unique. Carson argues that although it is possible, knowing the identity of ingredient 05, to work backward and find scientific references to it as a useful accelerating agent in depilatories, it is not possible, if the answer is not known in advance, to review those sources and know that ingredient 05 is contained in Gold Magic. What was obvious to Holmes was not always obvious to Watson. Although the sources cited by FDA make it clear that ingredient 05 is generally known as a useful accelerating agent in depilatories, Carson claims that they do not (without the help of hindsight) divulge that ingredient 05 is the single agent best suited for accelerating the depilatory action of Gold Magic's main ingredient, calcium thioglycolate. Carson thus relies principally on the synergistic effect of its combination of calcium thioglycolate and ingredient 05, asserting that Carson alone has been able to isolate ingredient 05 from the list of possibilities as an ideal additional agent for producing a fast acting, pleasant smelling depilatory product.
 
 
 41
 We find, however, that the three sources cited by the FDA contain more than passing references to ingredient 05. They disclose that it is the preferred ingredient to accomplish the very purposes to which Carson puts it.
 
 
 42
 Exhibit B is an excerpt from a reference work that reports the use of ingredient 05 as an accelerator in calcium hydroxide suspensions used for animal dehairing. Calcium hydroxide is a component of the thioglycolic acid-calcium hydroxide reaction which produces the substance calcium thioglycolate. Although exhibit B refers to processes used for the dehairing of animal hides rather than human skin depilation, and does not actually involve the reaction of ingredient 05 with calcium thioglycolate, it is an unequivocal public disclosure of the general proposition that ingredient 05 is useful as an accelerator of depilatory reactions.
 
 
 43
 Exhibit E, a foreign patent, specifically links ingredient 05 to thioglycolates. The inventor begins his description of the patent by stating:
 
 
 44
 The present invention relates to new catalysts for depilation compositions, that is to say agents which are intended to be worked into depilation against agents in order to considerably increase the speed of the keratolytic action (effect) of these compositions.
 
 
 45
 It has been known, that a majority of the depilation agents require a relatively long application time or induction period. This is particularly the case with thioglycolates, thiolactates, etc., and mercaptocarboxylate homolgoues of calcium and strontium.
 
 
 46
 The description then lists a series of chemical substances, including a form of ingredient 05, which might be used to accelerate the reaction of depilatory agents such as the thioglycolates. The form of ingredient 05 which is referred to in the patent, however, is described as the "preferred" substance. Although the form of ingredient 05 used by Carson is not exactly the same as that described in the exhibit E patent, the difference is insignificant. Ingredient 05 used by Carson in its dry powder product is a simple derivative form of the exhibit E substance which any chemist would know is best suited for dry use.
 
 
 47
 Exhibit F is a second foreign patent that is directly concerned with the production of human depilatories that are stable, have a pleasant odor, and act within three to five minutes. The patentees mention thioglycolic acid salts as good ingredients for such a product but state that their use is prohibited by the law of the country issuing the patent. Ingredient 05 is then listed as one of the substances to be included in the depilatory. In the exhibit F patent, however, ingredient 05 is not used primarily as an accelerator but rather to form a compound that itself acts as the primary depilation agent in the product.
 
 
 48
 These sources establish that ingredient 05 and its various forms can be used to accelerate the depilation action of substances such as calcium thioglycolate. The exhibit E patent mentions a form of ingredient 05 as the preferred accelerator for thioglycolates and other depilatory agents, and the exhibit F patent involves a combination of ingredient 05 and a substitute for calcium thioglycolate to produce a product with attributes very similar to Gold Magic. It is not significant that the reference to ingredient 05 in the exhibit E patent comes as part of a series of possible depilatory accelerators which could be used in combination with several principle depilatory substances. Nor is it important the exhibit F patent mentions a substitute for thioglycolates in the patent formula, or that the chemical reaction in the exhibit F patent is different from the reaction in Gold Magic. The public disclosure needed to negate trade secret status is a published recognition that ingredient 05 can be successfully utilized to accomplish the purposes to which Carson puts it. That information may be exposed even though it is not the precise subject of a patent, and whether or not anyone has ever actually used ingredient 05 in the way that Carson does.
 
 
 49
 Carson readily admits that calcium thioglycolate is a primary base ingredient for depilatory products in the United States, and Carson has never claimed that its use of calcium thioglycolate can be the subject of a trade secret. The only analytic difference between calcium thioglycolate and ingredient 05, however, is that the former is used by Carson's competitors but the latter is not. The FDA's sources teach the reader that ingredient 05 will work favorably as an accelerator of calcium thioglycolate. Any competitor wishing to find the identity of the accelerator in Gold Magic could, by doing its homework of studying these available sources, readily ascertain its presence in Gold Magic. Since the disclosure required by the FDA does not include quantity or percentage levels or details of the chemical reaction which occurs during a product's use, it is immaterial that the sources cited by the FDA might not reveal exactly how ingredient 05 works its magic in the Carson product. All that is necessary is the identification of ingredient 05 as the likely catalyst, and that much the sources clearly reveal.
 
 
 50
 The sources constitute substantial evidence supporting the action of the FDA, and the FDA's assessment of those sources was considered and rational, not arbitrary and capricious.
 
 The judgment of the district court is
 
 51
 AFFIRMED.
 
 
 
 [1]
 The appellation "05" is the numerical designation given Carson's secret ingredient in its filing before the FDA; the designation is adopted here to preserve the ingredient's confidentiality
 
 
 [2]
 Carson has not attempted to preserve the confidentiality of any of the ingredients within Gold Magic except ingredient 05. Although the relationship between ingredient 05 and calcium thioglycolate is an integral aspect of Carson's secrecy claim, Carson has never suggested that calcium thioglycolate itself, a commonly used depilatory agent, could be subject to trade secret status
 
 
 [3]
 To the uninitiated, it might be thought that Carson's secret could be discovered by its competitors through chemical analysis of Gold Magic. The chemical properties of the crucial ingredients within Gold Magic are such, however, that they are not readily ascertainable by quantitative and qualitative chemical analysis. The phenomenon is not unusual; we are told, for example, that the formula for Coca-Cola still remains a trade secret
 
 
 [4]
 Our references to the various sources cited by the FDA in this litigation are necessarily veiled, again in the interest of confidentiality. We adopt the exhibit designation for the sources as contained in the In camera record from the district court. The source cited in the first FDA letter was designated in the record as exhibit B
 
 
 [5]
 Since we hold that in the particular case before us, Carson was not denied due process at the agency level, we need not reach the question of whether a thorough review of the merits of the FDA's action by the district court could obviate the need for a remand to the agency had a due process violation been found. See Ferguson v. Thomas, 430 F.2d 852, 858 (5th Cir. 1970)
 
 
 [6]
 As we held in part II of this opinion, our review of the FDA's action under the "substantial evidence" and "arbitrary and capricious" tests of the APA is made on the basis of the evidence and reasons cited by the agency in its letters to Carson, and does not include sources cited in the litigation before the district court but never before mentioned to Carson
 
 
 [7]
 The two foreign patents relied on by the FDA were both filed in the U.S. Patent Office